506 F.2d 572
 7 ERC 1555, 5 Envtl. L. Rep. 20,024
 MOLOKAI HOMESTEADERS COOPERATIVE ASSOCIATION and Life of the
Land, Plaintiffs-Appellants,
v.
Rogers B. MORTON, Individually and in his capacity as
Secretary, United States Department of the Interior, and
Sunao Kido, Individually and in his capacity as Chairman,
Board of Land and Natural Resources, State of Hawaii,
Defendants-Appellees, and Kaluakoi Corporation, a Hawaii
corporation, Defendant-Intervenor-Appellee.
 No. 73-2934.
 United States Court of Appeals, Ninth Circuit.
 Oct. 29, 1974.
 
 Philip D. Bogetto (argued), Honolulu, Hawaii, for plaintiffs-appellants.
 William C. McCorriston, Asst. U.S. Atty., Honolulu, Hawaii, and Edwin P. Watson, Deputy Atty. Gen. (argued) for defendants-appellees.
 A. Bernard Bays, Honolulu, Hawaii (argued), for defendant-intervenor-appellee.
 Before HAMLEY and DUNIWAY, Circuit Judges, and NEILL,* District judge.
 OPINION
 HAMLEY, Circuit Judge:
 
 
 1
 Molokai Homesteaders Cooperative Association (Homesteaders) and Life of the Land, brought this action for injunctive relief against Rogers B. Morton, Secretary of the Department of the Interior (Department) and Sunao Kido, Chairman, Board of Land and Natural Resources, State of Hawaii (Board). Homesteaders is a voluntary organization composed of farmers living on the island of Molokai, State of Hawaii, and represents all of the farms in the area served by the Molokai Irrigation System (System). Life of the Land is a nonprofit corporation having a membership of approximately eight hundred persons concerned with the proper use and development of land, water, transportation and human resources of the State of Hawaii.
 
 
 2
 In their complaint, stated in four causes of action, plaintiffs brought into question the authority of the Board to negotiate and enter into a contract with Kaluakoi Corporation (corporation) providing for the rental and use, by the corporation, of water facilities and space within the pipelines of the System for the purpose of conveying the corporation's well water to its proposed resort complex on the west end of the island. The company was permitted to intervene as a defendant.
 
 
 3
 District court jurisdiction was asserted under 5 U.S.C. 701-706 (Administrative Procedure Act), 28 U.S.C. 1331 (federal question), 28 U.S.C. 1361 (mandamus), 43 U.S.C. 371 et seq. (reclamation and irrigation) and 42 U.S.C. 4321 et seq. (National Environmental Policy Act of 1969).
 
 
 4
 The district court entered an order denying plaintiffs' motion for a preliminary injunction. The federal defendant thereafter moved to dismiss the action or, in the alternative, for summary judgment. Plaintiffs were then permitted to file an amended complaint, stating the same four causes of action but with some additional allegations, and adding a prayer, in the alternative, for declaratory relief. The court ordered that the motion of the federal defendant, referred to above, would apply to the amended complaint. Counsel stipulated that the case could be submitted without the taking of evidence in addition to that which had already been received.
 
 
 5
 This evidence shows the following: construction of the irrigation system in question was begun in 1958 with funds provided by the Territorial Legislature of Hawaii. Upon achieving statehood and therefore eligibility for funds under the Small Reclamation Projects Act of 1956, 43 U.S.C. 422a et seq., the state filed a loan application with the appropriate federal agency in 1961. The loan was approved and a repayment contract was entered into between the Department and the Board on June 3, 1963.
 
 
 6
 The total cost of the project was approximately nine million, nine hundred and ten thousand dollars, of which approximately four million, four hundred thousand was loaned by the federal government and the balance contributed by the State of Hawaii. Construction was completed in 1969.
 
 
 7
 The System contains the Waikolu Valley Diversion Works, tunnel, feeder mains, reservoir, and distribution works. It delivers water for irrigation to lands at Hoolehua and Mauna Loa, Molokai. The System has the capacity to carry twenty-one million gallons of water per day and was envisioned to serve approximately thirteen thousand, six hundred and fifty acres of pineapple land and four hundred acres of diversified crop land. However, the System presently serves seven thousand, seven hundred and seventy-nine acres of pineapple land and one hundred ninety-nine acres of diversified crop land, and requires only two million gallons of water per day for this purpose.
 
 
 8
 As stated above, the corporation wishes to rent space within the water facilities of the System to serve its proposed resort complex on the west and of Molokai. The plans submitted to the Hawaii Land Use Commission in 1968 depicted the development of three thousand six hundred hotel units, three thousand, four hundred and four villas and cottages, and six thousand, six hundred and five houses and townhouses in two phases by 1984, with an estimated population of thirty thousand. The area is presently undeveloped.
 
 
 9
 The water which the corporation would inject into the System would have a saline content not present in the water now being carried in the System. Plaintiffs characterize the water to be added as 'highly saline.' However, the evidence indicates that the quality of the water to be added would be well within the limits recommended by the United States Public Health Service. In fact, water in the irrigation system after such a mingling of water would be of such quality that it would be suitable for use in a domestic water system.
 
 
 10
 On January 12, 1973, the Board by a majority vote of its members approved the application of the corporation for permission to rent space within the System. This had the effect of authorizing the Chairman of the Board to enter into negotiations with the corporation on a contract for such use of the System's facilities.
 
 
 11
 In their amended complaint, plaintiffs seek to enjoin defendant from negotiating or entering into an agreement with the corporation for the described use of the pipeline and other facilities of the System:
 
 
 12
 'unless and until the Defendants, upon application to this Court, show that they have satisfactorily and adequately complied with the requirements of the above-discussed federal and state statutes and executive orders and regulations promulgated thereunder.'
 
 
 13
 In the alternative, plaintiffs ask for a judicial declaration that the application of the corporation to rent space within the pipeline and other water facilities cannot be granted because:
 
 
 14
 'the proposed use is in violation of the Reclamation Laws 43 USC 371 et seq. and particularly 43 USC 422a-k and further that the proposed rental of space . . . is in violation of the terms of the contract entered into between the U.S. Department of the Interior and the State of Hawaii for the benefit of the people living and farming on Hawaiian Homes land.'
 
 
 15
 After final arguments the district court entered a 'Final Decision and Order,' denying a permanent injunction. The court did not specifically pass upon the alternative prayer for declaratory relief. However, the parties have apparently accepted the 'Final Decision and Order' as a denial of such relief, and we therefore do likewise.
 
 
 16
 Homesteaders and Life of the Land appeal. We affirm.
 
 
 17
 Before turning to plaintiffs' points on appeal we must consider a jurisdictional question and take note of a question as to the standing of plaintiff Life of the Land.
 
 
 18
 The corporation argues that the district court was without federal question jursidiction under 28 U.S.C. 1331 because plaintiffs have failed to show damages in excess of ten thousand dollars. This failure, the corporation asserts, is evidenced by the fact that the district court found no proof of irreparable damage in excess of ten thousand dollars.
 
 
 19
 In their joint complaint, plaintiffs alleged that the amount in controversy exceeds ten thousand dollars, exclusive of interests and costs. Since the plaintiffs are asserting one undifferentiated claim rather than separate demands, the jurisdictional amount required by 28 U.S.C. 1331 is sufficiently pleaded. Clark v. Paul Gray, Inc., 306 U.S. 583, 59 S.Ct. 744, 83 L.Ed. 1001 (1939). Where, in the district court, neither defendants nor the court questions the good faith of the allegation, the jurisdictional question is determined by the allegations of the complaint. Saint Paul Mercury Indemnity Co. v. Red Cab Company, 303 U.S. 283, 288, 58 S.Ct. 586, 82 L.Ed. 845 (1938).
 
 
 20
 In the district court the answers of some of the defendants contain a pro forma denial of the allegation as to jurisdictional amount. But, insofar as we can determine, neither defendants nor the the court seriously questioned the good faith of the allegation as to the jurisdictional amount. Indeed, no issue, jurisdictional or otherwise, was pursued as to the amount of monetary damages, since plaintiffs were not seeking damages.
 
 
 21
 It is true that, in resisting the prayer for injunctive relief, defendants asserted that plaintiffs did not stand to sustain irreparable damage. But plaintiffs might well suffer monetary damages far in excess of ten thousand dollars and still not be able to show irreparable damage.
 
 
 22
 Since the good faith of the jurisdiction allegation was not challenged, the district court was not called upon to question its accuracy. We hold that the court had jurisdiction under 28 U.S.C. 1331.
 
 
 23
 The federal defendant asserts, on appeal, that Life of the Land does not meet the standing criterion established by Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), and Data Processing Service Organizations, Inc. v. Camp., 397 U.S. 150, 152-154, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).
 
 
 24
 This issue was raised in the district court. However, the court declined to rule on the issue, stating that it made no material difference because Homesteaders, which asserted the same claim, unquestionably had standing. Since we are affirming the district court judgment we likewise perceive no need to determine this standing question.
 
 
 25
 On the merits, plaintiffs first argue that the Board is without authority, statutory or contractual, to approve the corporation's application for use of space within the facilities of the System for non-irrigation purposes. The reason plaintiffs give for this view is that, under the terms of the Small Reclamation Projects Act of 1956 and the provisions of the repayment contract between the United States and the State of Hawaii, the System's facilities may only be used to provide irrigation water.
 
 
 26
 The declared purpose and the substance of the Act belie this conclusion. The Congressionally declared purpose of the Small Reclamation Projects Act of 1956, is to encourage state and local participation in the development of projects under the federal reclamation laws and to provide for federal assistance in the development of similar projects by non-federal organizations. 43 U.S.C. 422a. As originally enacted, and continuing beyond the time the System obtained its federal loan, this Act defined the term 'project' to mean:
 
 
 27
 '(i) any complete irrigation undertaking, including incidental features thereof, or distinct unit of such an undertaking or a rehabilitation and betterment program for an existing irrigation project, authorized to be constructed pursuant to the Federal reclamation laws and (ii) any similar undertaking proposed to be constructed by an organization . . ..' 43 U.S.C. 422b(d).[1]
 
 
 28
 That this definition of the term 'project' was not intended to restrict such undertakings to those used exclusively for irrigation is indicated by another provision of the 1956 Act, pertaining to the functioning of the Secretary of the Interior. We refer to 43 U.S.C. 422d(e), which lists the factors the Secretary shall take into consideration. One of these factors is '. . . whether the proposed project is primarily for irrigation.'
 
 
 29
 In our opinion, this means that if such an undertaking is 'primarily' for irrigation, it is acceptable to have the undertaking also serve a secondary compatible purpose.[2] The statute has been so administratively interpreted and, in fact, was so interpreted in the repayment contract between the United States and the State of Hawaii, here in question. The third preliminary recital in that contract reads:
 
 
 30
 'Whereas, the proposal of the Department (Board) is for the construction of Waikolu Valley Diversion Works, tunnel, feeder mains, reservoir, and distribution works, primarily for the purpose of delivering water for irrigation to lands within the localities known as: Hoolehua and Mauna Loa, Molokai, State of Hawaii; and . . .[3]
 
 
 31
 The background facts pertaining to the project, reviewed above, clearly indicate that even with the full use of the System's facilities under the corporation's plans, the facilities will nevertheless be utilized primarily for irrigation purposes.[4]
 
 
 32
 Continuing with this same theory, lack of authority, plaintiffs next contend that under Rule XX of the rules and regulations governing the System's operation, the Board is forbidden to enter into the proposed lease arrangement with the corporation with out first consulting with the Secretary of the Interior as to whether or not the proposed use is permitted under the applicable laws. Rule XX reads:
 
 
 33
 'These rules and regulations are subject to the provisions of the Contract dated June 3, 1963 between the State of Hawaii and the United States of America under which federal funds were made available for the construction of the Molokai Irrigation System.'
 
 
 34
 Since this point was raised for the first time in this court in plaintiffs' reply brief, and, so far as we can determine, was not raised in the district court, we are not required to give it consideration. Nevertheless, we deal with it briefly.
 
 
 35
 It is apparent that Rule XX does not expressly require the Board to consult the Secretary concerning proposals of the kind that are before us. Nor does Rule XX add to the Board's duties, or limit its authority, in any respect not already required by the repayment contract. This latter document does not require approval by the Secretary of the Interior as to undertakings which do not threaten the functioning of the System's facilities for irrigation purposes. Moreover, it is obvious that the Secretary of the Interior is aware of the proposal and perceives no threat to the operation of the System's facilities for irrigation purposes, as evidenced by the position taken by Government counsel in this litigation.
 
 
 36
 Plaintiffs, also for the first time on appeal, argue that the Board is without state statutory authority to enter into a contract with the corporation because, under Hawaii Revised Statutes 175-2, the only persons with whom the Board is authorized to enter into contracts, in addition to the United States and its agencies, are 'domestic water users including the county of Maui.' Plaintiffs assert that the corporation is not a 'domestic water user.'
 
 
 37
 This is another argument advanced for the first time in plaintiffs' reply brief and which we are therefore not required to notice. However, we do point out that the reference to 'including the county of Maui' makes it clear that the term 'domestic water users' is not intended to refer exclusively to ultimate users of water for domestic purposes but also embraces distributors of water for domestic use. The corporation will be such a distributor.[5]
 
 
 38
 Plaintiffs' next line of argument is to the effect that 43 U.S.C. 521 requires the Secretary of the Interior to be a party to contracts such as that which the Board and the corporation propose to enter into, covering the use of the System's facilities to convey the corporation's water to its planned resort complex on the west end of Molokai. Since it is not proposed that the Secretary aid in negotiating, or approve, this contract, plaintiffs argue, the Board is without authority to consummate the rental arrangement.
 
 
 39
 The purpose of the federal reclamation and irrigation laws is to reclaim arid lands in the western region of the United States through the construction and maintenance of irrigation systems, to produce power and for other incidental purposes. Cf. Henkel v. United States, 237 U.S. 43, 49, 35 S.Ct. 536, 59 L.Ed. 831 (1915); Burley Irrigation District v. Ickes, 73 U.S.App.D.C. 23, 116 F.2d 529, 530-532 (1940). The statute in question,43 U.S.C. 521, was enacted in 1920 as an integral part of the general federal reclamation and irrigation laws. The comprehensive scheme evidenced by these general reclamation and irrigation laws requires the involvement of the United States and its resources.
 
 
 40
 On the other hand, the Small Reclamation Projects Act, enacted in 1956, which provides the authority for the repayment contract here in question, is a separate legislative plan that allows state governments to develop their arid land resources through relatively small reclamation projects.[6] Thus the construction of 43 U.S.C. 521 proposed by plaintiffs would thwart the fundamental policy of local land reclamation which is the basis of the Small Reclamation Projects Act.
 
 
 41
 We agree with the district court's determination that 43 U.S.C. 521 does not apply to projects constructed under the 1956 Act. It is true, as the district court pointed out, that a provision of the 1956 Act, namely 43 U.S.C. 422k, provides that provisions of the Small Reclamation Projects Act of 1956, 'shall be a supplement to the Federal reclamation laws.' But this does not mean that all provisions of the general federal reclamation and irrigation laws, including 43 U.S.C. 521, shall apply to projects sanctioned by the 1956 Act.
 
 
 42
 It is apparent to us that the requirement of 43 U.S.C. 521 that the Secretary of the Interior be a party to contracts to supply water from any project irrigation system for purposes other than irrigation, runs counter to the provisions of the 1956 Act vesting contracting authority in a local organization, as defined in 43 U.S.C. 422b(c), which constructs and operates a small irrigation project. 43 U.S.C. 422d(e). In dealing with a small reclamation project, where the provisions of the general laws run at cross-purposes with those of the 1956, Act, the latter must prevail.
 
 
 43
 Moreover, even if 43 U.S.C. 521 were held to apply to projects entered into under the 1956 Act, it would have no application in the case before us. Section 521 clearly applies only in the case of the proposed sale of surpluswaters derived from a project irrigation system. The proposed contract here in issue does not involve the sale of the System's water, surplus or otherwise. It contemplates only the transportation of the corporation's water from its wells on the windward side of Molokai through the System's facilities to the proposed resort complex on the west end of that island.
 
 
 44
 We therefore hold that neither contractual approval by the Secretary of the Interior nor any other federal action is required by 43 U.S.C. 521 with respect to the rental arrangement here in question.
 
 
 45
 Plaintiff's final line of argument is to the effect that a provision of the National Environmental Policy Act (NEPA), 42 U.S.C. 4332(2)(C), and the Department of the Interior's Bureau of Reclamation Rules and Regulations,[7] require that an environmental impact statement be prepared before this rental arrangement may be contractually sanctioned.
 
 
 46
 NEPA provides that all agencies of the federal government shall include in every recommendation or report on proposals for legislation 'and other major Federal actions' significantly affecting the quality of the human environment, a detailed statement on the environmental impact of the proposed action. 42 U.S.C. 4332(2)(C).
 
 
 47
 For present purposes we assume that, in entering into the repayment contract in connection with the construction of the System's facilities, the federal government engaged in 'major Federal' action. But that contract was entered into on June 3, 1963, and the project was completed in 1969, prior to the enactment of NEPA on January 1, 1970.
 
 
 48
 It might be argued that although the federal loan was obtained prior to the enactment of NEPA, the operation of the loan contract, with its continuing obligation for repayment, in effect transformed the project into one involving continuing major federal action. See Jicarilla Apache Tribe of Indians v. Morton, 471 F.2d 1275, 1282-1283 (9th Cir. 1973). As a variation of this argument it might be contended that the continuing right of the Secretary of the Interior to interject himself into the affairs of the System in the event of non-compliance with the terms of the repayment contract, in effect rendered the Secretary's decision not to participate in this particular rental negotiation, 'major Federal' action. See Jicarilla Apache Tribe of Indians, supra.
 
 
 49
 We do not believe that either of these theories are tenable. Our views in this regard find support in the First Circuit's decision in City of Boston v. Volpe, 464 F.2d 254, 258 (1st Cir. 1972).[8] See also San Francisco Tomorrow v. Romney, 472 F.2d 1021, 1024-1025 (9th Cir. 1973); Named Individual Members of the San Antonio Conservation Society v. Texas Highway Department, 496 F.2d 1017, 1021-1024 (5th Cir. 1974). The right of the federal government to object to violations of its loan agreements, or its determination not to object, cannot realistically be classified as 'Federal action,' much less 'major' federal action.
 
 
 50
 The Bureau of Reclamation regulations to which plaintiffs refer are only applicable to projects completed before the effective date of the Act where there is continuing major action by the Bureau.[9] We have already determined that the federal government is not engaged in any major action with respect to the lease arrangement here in question. San Francisco Tomorrow v. Romney, supra; City of Boston v. Volpe, supra.
 
 
 51
 Affirmed.
 
 
 
 *
 The Honorable Marshall A. Neill, United States District Judge for the Eastern District of Washington, sitting by designation
 
 
 [1]
 This definition of the term 'project' was amended in 1971 to add, among other things, 'any multiple-purpose water resource project that is authorized or is eligible for authorization under the Federal reclamation laws.' Pub.L. 92-167, 1, 85 Stat. 488 (Nov. 24, 1971). Since the expanded definition was not in effect when the project here in question was approved for a federal loan, we do not take it into account in deciding the issue before us
 
 
 [2]
 Presumably, the appellants read the statute and contract term 'primarily' in a similar manner, for in their opening brief they admit that the System is 'to produce irrigation water for the use in the agricultural production of plant crops or livestock, including incidental domestic use.'
 
 
 [3]
 Our construction of the term 'project,' as defined in the 1956 Act, also finds support in the legislative history. House Report No. 481 on H.R. 5881, 84th Congress, Second Session, U.S.Code Cong. & Admin.News 1956, p. 4378, contains this statement:
 'With respect to the term 'project,' it is the committee's intention that the projects be for the principal purpose of irrigation with other purposes, such as flood control, municipal water and power included on an incidental basis.'
 The incidental uses referred to in this statement are not intended to be all inclusive, since they are preceded by the words 'such as.' In any event, the corporation's proposed use of the System's facilities is essentially for domestic water supply, which is analogous to 'municipal water.'
 43 U.S.C. 422d(e) was also amended in 1971 to comport with the theory that such an undertaking may be multi-purpose in nature. Pub.L. 92-167, 2, 85 Stat. 488 (Nov. 24, 1971).
 
 
 [4]
 Plaintiffs call attention to Rule II(2) of the rules and regulations governing the System's operation on Molokai. That rule provides, in part, that:
 '2. The water supplied by the Molokai Irrigation System is intended to be used only for production of crops. Water may not be used for any other purpose except with the express written consent of the Board . . ..'
 As pointed out earlier, the Board has authorized its Chairman to enter into negotiations with the corporation concerning the rental of space within the System, and there is no reason to believe that the Board would not ratify any contract so negotiated before effectuating the agreement. In any event, in our view, the quoted rule is not applicable here, because it pertains only to proposals for the System to supply its own water for non-irrigation purposes. The rental arrangement here under consideration does not contemplate that the System will supply to the corporation any of the System's water.
 
 
 [5]
 The doctrine of pendent jurisdiction allows us to reach this purely state law question. United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)
 
 
 [6]
 See H.R.Rep.No. 481, 84th Cong., 2d Sess., U.S.Code Cong. and Admin.News, at 4376-4377 (1956)
 
 
 [7]
 The particular regulation upon which plaintiffs rely is Chapter 376.5.2B
 
 
 [8]
 In City of Boston v. Volpe, the First Circuit said:
 'We do not accept the general proposition that once the federal government has participated in a development, that development is necessarily forever federal. Many projects have federal assistance at an exploratory stage and are then completed through wholly local or state funding . . .. Nor does the Port Authority's present intention eventually to seek federal funds for yet another stretch of taxiway make the Outer Taxiway a federal project. Similarly, the adoption of certain federal standards and specifications in the hope of qualifying for federal assistance cannot transform a state or local project into a federal one.' 464 F.2d at 258.
 
 
 [9]
 Regulation 376.5.2B, which applies to actions initiated before January 1, 1970, provides, in part:
 'The provisions of this chapter apply to continuing major Bureau actions having a significant effect on the environment even though they arise from projects or programs initiated prior to the enactment of the Act.'