EMMA AH HO, et al., Plaintiffs-Appellants, *v.*
CHRISTOPHER COBB, Chairman, Board of Land
and Natural Resources, et al., Defendants-Appellees

NO. 6459

SEPTEMBER 30, 1980

RICHARDSON, C.J., OGATA, MENOR,
LUM AND NAKAMURA, JJ.

OPINION OF THE COURT BY OGATA, J.

Plaintiffs-appellants, Hawaiian Homesteaders (herein-
after "appellants"), appeal from the Second Circuit Court's
judgment entered on December 3, 1976, denying injunctive

and declaratory relief in favor of defendants-appellees. Christopher Cobb, as Chairman of the Board of Land and Natural Resources, and Board of Land and Natural Resources. State of Hawaii (hereinafter "Board"). Kaluakoi Corporation (hereinafter "Kaluakoi"), and the County of Maui. We affirm.

The appellants are seventy lessees of 40 acre farm lots on the island of Molokai, County of Maui. under the Hawaiian Homes Commission Act of 1920. Their irrigation water is supplied by the Molokai Irrigation System (hereinafter "System") which consists of the Waikolu Valley Diversion Works, a tunnel, feeder mains, a reservoir and distribution pipelines. The System has a flow capacity of 21 million gallons per day of which only 5.5 million per day is presently utilized. In 1972, Kaluakoi submitted a written application to the Board for the rental of excess transmission capacity in the System to transport water from its well in central Molokai to its proposed resort development in West Molokai.

The Board held a public meeting on October 11, 1972, to discuss Kaluakoi's application at the Molokai Community Center. On December 6, 1972, an environmental impact assessment statement conducted pursuant to Governor Burns' Executive Order of August 23, 1971, was filed with the Office of the Environmental Quality Commission. It concluded that the rental of excess space in the System to Kaluakoi would not significantly affect the environment. Subsequently, on January 12, 1973, the Board unanimously authorized its chairman to enter into an agreement with Kaluakoi.

The Hawaiian Homesteaders were concerned that their irrigation water from the System would be allocated to Kaluakoi's domestic consumers in the event of a water shortage. They challenged the validity of the Agreement in a series of three lawsuits.

On February 9, 1973, the Molokai Homesteaders Cooperative Association and Life of the Land brought a suit against the United States Secretary of the Interior in the United States District Court for the District of Hawaii. The District Court denied their claims for declaratory and injunctive relief, and the United States Court of Appeals for the

Ninth Circuit affirmed that decision on October 29, 1974. *Molokai Homesteaders Cooperative Association v. Morton*, 356 F. Supp. 148 (D. Haw. 1973), *aff'd*, 506 F.2d 572 (9th Cir. 1974).

After the Ninth Circuit Court's ruling, the Board executed the Kaluakoi Agreement on July 11, 1975.

The Molokai Homesteaders Cooperative Association and numerous named individuals also brought an action in the First Circuit Court on December 15, 1975, alleging violations of HRS chs. 343 and 344. *Molokai Homesteaders Cooperation Association, et al., v. Christopher Cobb, et al.*, Civil No. 47007. Judgment was entered in favor of the Board, Kaluakoi Corporation, and the County of Maui on August 25, 1976, and that decision is presently on appeal·to this Court. S. Ct. Appeal No. 6403.

In the meantime, this action was commenced by numerous individual Homesteaders in the Second Circuit Court seeking injunctive and declaratory relief. The Homesteaders contend that the Board's failure to comply with the provisions of HRS chs. 91, 171, and 174 renders the Agreement void. A jury-waived trial on the merits was held on November 1, 1976, and the Homesteaders stipulated to the dismissal of their Fifth through Eighth Claims concerning the quality of Kaluakoi's water. Judgment was entered against the Homesteaders on December 3, 1976, and they filed this appeal.

I.

The appellants do not dispute the authority of the Board to contract with Kaluakoi. The Molokai Irrigation and Water Utilization Project was established to "serve and supply the owners and occupants on the island of Molokai." HRS § 175-2. The Board has the power to contract with "domestic water users" pursuant to HRS § 175-2, and the term encompasses distributors of water for domestic use such as Kaluakoi.[1]

---

[1] *See* Molokai Homesteaders Cooperative Association v. Morton, 506 F.2d 572, 579 (9th Cir. 1974).

The agreement does not jeopardize or prejudice the quality or quantity of the State water. The Agreement requires Kaluakoi to install devices to monitor the chloride content of the water it injects into the System. Kaluakoi's water must meet the drinking water standards established by the State of Hawaii Department of Health. In appellants' stipulation to their dismissal of their Fifth to Eighth Claims on November 1, 1976, they agreed that the injection of Kaluakoi's water with a chloride content of 250 parts per million or less will not cause pollution of the System or detrimentally affect them. The Department also reserved the right to limit or control any chemical, physical, or biological constituent of Kaluakoi's water if it will harm the System's original function and purpose.

In addition, the Agreement will not deplete the State's water supply. Kaluakoi is limited to a maximum transmission flow of 2.2 million gallons per day and can only withdraw the amount of water that it injects into the System, less 10 percent to compensate for water system losses. Thus, if Kaluakoi does not inject any water into the System, it cannot withdraw any State water.

In the event of a drought or an emergency, the State reserved the right to set priorities and control the allocation of water. Under HRS § 175-4, the Hawaiian Homesteaders "shall at all times, upon actual need therefor being shown to the board, have a prior right to two-thirds of the water developed for the irrigation and water utilization project. . . ." The Agreement is also subject to Rule III(5) of Regulation 1 which states that during water shortages, the State will assure all consumers of receiving a fair share of the irrigation water available.

## II.

First, the appellants contend that the Agreement is void because it was not promulgated pursuant to HRS ch. 91, the Hawaii Administrative Procedure Act (HAPA), as required

by HRS ch. 175, the Molokai Water Utilization Project.[2]

The appellants' argument does not persuade us because the Agreement is not a "rule" within the meaning of HRS § 91-1(4).

"Rule" means each agency statement of general or particular applicability and future effect that implements, interprets, or prescribes law or policy, or describes the organization, procedure, or practice requirements of any agency. The term does not include regulations concerning only the internal management of an agency and not effecting private rights of or procedures available to the public, nor does the term include declaratory rulings issued pursuant to section 91-8, nor intra-agency memoranda.

The Agreement does not contain statements by the Board which have general or particular applicability and future effect that implements, interprets, or prescribes law or policy. The definition includes statements of "particular" as well as "general applicability" in order to cover situations of rule making addressed to named persons.[3] We noted in *Aguiar v. Hawaii Housing Authority*, 55 Haw. 478, 485-6, 522 P.2d 1255, 1261, n.13 (1974), that the use of the words "or particular" has not significantly changed the meaning of rule or rule making.

The appellants argue that the Agreement is a rule because it prescribes new agency policy. They contend that Rule II(2)[4] of Regulation 1 established that the System was developed

---

[2] Section 175-8 states:

The board of land and natural resources may perform any and all acts and make such rules and regulations as may be necessary and proper for the purpose of carrying out this chapter, which upon compliance with chapter 91 shall have the force and effect of law.

[3] *See* 2 K. Davis, *Administrative Law Treatise* § 7:3 at 10-11 (2d ed. 1979); 1 F. Cooper, *State Administrative Law* 113 (1965).

[4] Rule II(2) states:

The water supplied by the Molokai Irrigation System is intended to be used only for production of crops. Water may not be used for any other purpose except with the express written consent of the Board. . . .

exclusively for irrigation water service and that the Agreement has changed the purpose of the System to domestic water service.

However, HRS § 175-2 states that the System was developed to serve and supply water to the owners and occupants of Molokai for irrigation, domestic, and other purposes. Regulation 1 of the Rules and Regulations Governing Irrigation Water Service to the Consumers of the Molokai Irrigation System of the Department of Land and Natural Resources (1970) only governs irrigation service. Rule II(2) of Regulation 1 acknowledges the authority of the Board to supply State water for non-irrigation use. Nevertheless, the Agreement could not amend the Rules because Kaluakoi is not using any State water.[5]

The appellants next contend that paragraph 10 of the Agreement amends Rule XI(6) of Regulation 1. Rule XI(6) states that the Board "may refuse to furnish water and may discontinue the service to any premises where the demands of the consumer will result in inadequate service to others." Paragraph 10 does not change this rule and only applies where the Board decides to rescind the Agreement because the System's capacity is insufficient to meet agricultural needs. The Board is required to give Kaluakoi two years notice in this situation so that Kaluakoi can construct its own pipelines or develop other water sources.

We also reject the appellants' contention that the Agreement amends the Regulation's acreage assessment pricing method. Kaluakoi is not purchasing State water, and the Agreement's flat annual rental fee does not affect the regulation.

The Agreement was excluded from the definition of "rule" because it concerns only the internal management of

---

[5] *See* Molokai Homesteaders Cooperative Association v. Morton, 506 F.2d 572, 578, n.4 (1974), where the court stated:

    . . . . In any event, in our view, the quoted rule is not applicable here, because it pertains only to proposals for the System to supply its own water for non-irrigation purposes. The rental arrangement here under consideration does not contemplate that the System will supply to the corporation any of the System's water.

the Board and does not affect the private rights of or procedures available to the public. Kaluakoi is not using State water and the contract does not affect the rights of the Homesteaders or other irrigation users. The Agreement only sets forth the contractual rights and obligations of Kaluakoi and the Board.

The contract for the transportation of Kaluakoi's water through the System concerns only the internal management of the Board. Legislative history states that "matters relating to . . . the custodial management of the property of the state or county or of any agency [are] primarily a matter of 'internal management.' " Stand. Com. Rep. No. 8, 1961 Hawaii House Journal 653, 656. We have held that internal management includes matters relating to the security of the prison and investigations of welfare fraud.[6] In *Holdman v. Olim*, 59 Haw. 346, 355-356, 581 P.2d 1164, 1170 (1978), we stated that "the internal management of an agency necessarily includes the custodial management of public property entrusted to the agency."

Here, the contract with *Kaluakoi* was a matter within the custodial management of the Board. The Board anticipated a reduction in its revenues from irrigation services because the pineapple companies were tentatively going to be phased out by 1975. The Agreement provides additional revenues to repay federal and state loans for the construction of the System. The development of Kaluakoi's land also increases employment opportunities and increases Kaluakoi's tax base.

The reasoning found in federal APA contract cases supports our conclusion that the Kaluakoi contract is excluded from the definition of rules.[7] The Eighth Circuit Court stated

---

[6] *See* Holdman v. Olim, 59 Haw. 346, 581 P.2d 1164 (1978); Tai v. Chang, 58 Haw. 386, 570 P.2d 563 (1977); Doe v. Chang, 58 Haw. 94, 564 P.2d 1271 (1977).

[7] The federal APA, 5 U.S.C. § 553(a)(2), specifically exempts agency contracts from the notice and hearing requirements. *See* Rainbow Valley Citrus Corp. v. Federal Crop Ins. Corp., 506 F.2d 467 (9th Cir. 1974) (federal crop insurance contract); Brown v. Housing Authority of City of Milwaukee, 471 F.2d 63 (7th Cir. 1972) (Annual Contributions Contract between HUD and local housing authority);

that "the government must be free from vexatious restraints which interfere with the manner in which it may dispatch its own internal affairs. . . ." *Housing Authority of City of Omaha, Nebraska v. United States Housing Authority*, 468 F.2d 1, 9 (8th Cir. 1972), *cert. denied,* 410 U.S. 927 (1973) citing *Perkins v. Lukens Steel Co.,* 310 U.S. 113, 127 (1940). The Ninth Circuit Court in *Rainbow Valley Citrus Corp. v. Federal Crop Ins. Corp.,* 506 F.2d 467 (9th Cir. 1974) stated:

> The practical necessity for the public contracts exception is apparent. It would be altogether unreasonable to require the various agencies of government to publish notice in the Federal Register and to hold hearings each and every time they entered into, rescinded, or canceled a government contract; the burden in time and expense would be extraordinary.

*Rainbow,* 506 F.2d at 469.

Thus, the Board was not mandated by HRS § 175-8 to adopt the Agreement pursuant to the provisions of the HAPA because it was excluded from the definition of "rules."

### III.

Second, the appellants contend that the Board violated HRS § 174-20(2) and (3) by establishing a domestic water system without the consent of a majority of the Homesteaders and without a prior determination that it would not prejudice or interfere with the supply of irrigation water. HRS § 174-20 begins:

> In conjunction with any irrigation project which it has established . . . the board of land and natural resources may establish a system for and supply water for domestic purposes. . . .

---

Housing Authority of City of Omaha, Nebraska v. United States Housing Authority, 468 F.2d 1 (8th Cir. 1972), *cert. denied,* 410 U.S. 927 (1973) (Annual Contributions Contract); Bonfield, *Public Participation in Federal Rulemaking Relating to Public Property, Loans, Grants, Benefits, or Contracts,* 118 U. Pa. L. Rev. 540 (1970).

An "irrigation project" is defined in HRS § 174-2 as an area "established under this [174] chapter." Since the System was established under HRS ch. 175, the Molokai Irrigation and Water Utilization Project, HRS § 174-20 does not apply.

The Agreement does not involve the sale of any State water to Kaluakoi for domestic purposes. In this connection, the Ninth Circuit Court stated:

> The proposed contract here in issue does not involve the sale of the System's water, surplus or otherwise. It contemplates only the transportation of the corporation's water from its wells on the windward side of Molokai through the System's facilities to the proposed resort complex on the west end of that island.

*Molokai Homesteaders Cooperative Association v. Morton*, 506 F.2d at 580. Kaluakoi is merely renting space within the System's pipelines. We do not perceive any violation of the statute by the Board.

## IV.

Third, the appellants contend that the Board violated HRS § 171-58 by disposing State water without complying with the public auction and notice provisions of HRS §§ 171-14 and 171-16. They argue that a portion of the water that Kaluakoi withdraws will be State water because Kaluakoi's water will commingle with State water within the System. However, Kaluakoi is limited to a maximum withdrawal of the amount that it injects less 10 per cent. The Agreement does not dispose of State water because the proportionate amount of State water in the System is not diminished.

The appellants similarly contend that the Board violated HRS § 171-32[8] by disposing public lands, the System's facilities, without complying with HRS §§ 171-14 and 171-16.

---

[8] HRS § 171-32 states:

Unless otherwise specifically authorized in this chapter or by subsequent legislative acts, all dispositions shall be by lease only, disposed of by public auction in accordance with the procedure set forth in sections 171-14 and 171-16.

This contention has no merit since the Board is not leasing any public land or interest in public land within the meaning of HRS ch. 171.[9] We do not construe a non-exclusive contractual right to use excess transmission capacity within the pipelines and facilities of the System as a disposition of public lands.

The appellants argue for the first time on appeal that the Board is permitting a private party to transport State water away from the land to which it is appurtenant contrary to *McBryde Sugar Co.·v. Robinson*, 54 Haw. 174, 504 P.2d 1330 (1973), *cert. denied*, 417 U.S. 976 (1974). While we are not required to give this argument consideration, *Miller v. Leadership Systems, Inc.*, 57 Haw. 321, 325, 555 P.2d 864, 867 (1976), we note that *McBryde, supra*, involved the ownership of running water in natural watercourses, streams and rivers. *McBryde* did not reach the question of ground water ownership and we do not believe that this is an appropriate case in which to decide this issue.

We hold that the Board of Land and Natural Resources did not violate the provisions of HRS chs. 91, 171, or 174 by entering into the Kaluakoi Agreement. Additionally, the appellants have failed to establish that they will be harmed by the Agreement or that any of its safeguard provisions has been breached. This court will not grant relief for mere conjectural harm.

Affirmed.

*Ronald Albu*, Legal Aid Society of Hawaii, for plaintiffs-appellants.

*James M. Sattler & Anne L. Williams* for defendant-appellee, Kaluakoi Corporation.

---

[9] HRS § 171-2 defines "public lands" as:

[A]ll lands or interest therein in the State classed as government or crown lands previous to August 15, 1895, or acquired or reserved by the government upon or subsequent to that date by purchase, exchange, escheat, or the exercise of the right of eminent domain, or in any other manner, including submerged lands, and lands beneath tidal waters which are suitable for reclamation, together with reclaimed lands which have been given the status of public lands under this chapter. . . .

*Edwin P. Watson*, Deputy Attorney General, for defendants-appellees, Christopher Cobb, Chairman, Board of Land and Natural Resources, the Board of Land and Natural Resources, State of Hawaii, and County of Maui.